

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00321-CR

———————————————

BRAYLIN LAMONT BROWN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1752454

---

Per Curiam Memorandum Opinion
Chief Justice Sudderth concurs without opinion

## MEMORANDUM OPINION

## I. Introduction

Forty-seven-year-old "Big Kevin" Brown—father of Appellant Braylin Lamont Brown[1]—was killed at his mailbox by Damond "Mon" Cotton in a drive-by shooting at 4:55 p.m. on January 25, 2022.[2] Phone records, videos, texts, and testimony tied Braylin, who was incarcerated,[3] to the murder. Braylin pled not guilty.

Braylin's jury charge included a law-of-parties instruction, allowing the jury to convict him if it found that, acting with the intent to promote or assist the murder's commission, he had solicited, encouraged, directed, aided, or attempted to aid another to commit Big Kevin's murder. *See* Tex. Penal Code Ann. §§ 7.02(a)(2), 19.02(b)(1)–(2), (c). The charge also identified his accomplices: Ashlynn Durham, Cotton's girlfriend and the driver of the vehicle from which Cotton shot Big Kevin, and Alexis Abeyta, one of Braylin's girlfriends, who—at his direction—bought bullets and gave them to Cotton; set up a three-way call from jail between Braylin and Big Kevin,

---

[1]We refer to the appellant by his first name and the victim by his nickname because they share the same last name. When others also share the same last name, we will use their first names or nicknames to avoid confusion.

[2]Cotton's murder conviction has been affirmed. *Cotton v. State*, No. 06-24-00079-CR, 2025 WL 700175, at *1 & n.1 (Tex. App.—Texarkana Mar. 5, 2025, no pet.) (mem. op., not designated for publication) (stating that Cotton "was convicted of being the gunman in a murder orchestrated by an inmate in the Tarrant County Jail").

[3]Braylin was arrested on January 16, 2021, on multiple warrants, and was awaiting trial on other shootings discussed later in the opinion.

allowing Braylin to ensure that Big Kevin was at the mailbox at the right time; and set up a three-way call between Braylin and Cotton after the shooting. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (requiring corroboration of accomplice testimony). The jury found Braylin guilty and assessed a life sentence after he pled "true" to a repeat-offender allegation[4] and the State presented other evidence. *See* Tex. Penal Code Ann. § 12.42(c)(1) (punishment range).

In five points, Braylin challenges some evidentiary rulings and the sufficiency of the evidence to support his conviction. We will affirm.

## II. Background

Because Braylin challenges the sufficiency of the nonaccomplice evidence to link him to Big Kevin's murder, we begin first with that evidence, which reveals Braylin as the offense's mastermind. We will identify Braylin's four evidentiary points as we recount the complained-of evidence. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016) (stating that when performing a sufficiency review, the court must consider all the evidence admitted at trial, even if it was improperly admitted).

---

[4]We will correct the judgment to reflect that Braylin pled "true" to the allegation. *See* Tex. R. App. P. 43.2(b).

3

## A. The State's guilt–innocence case—nonaccomplice evidence[5]

### 1. Braylin's family

Big Kevin had six children: Little Kevin, four daughters—including Lawanda "Tink" Brown—and Braylin, the youngest. Little Kevin died on January 19, 2016. Little Kevin's paramour Rebecca "Shay" Willis testified that Braylin and Little Kevin had been very close, that Braylin had been very loyal to him, and that his death had devastated Braylin.

Shay appeared on the body-camera footage[6] of Fort Worth Police Corporal Jedidiah Miller, the first officer to respond to the shooting. The footage showed Shay's caring for Big Kevin while he bled and her telling Corporal Miller that Big Kevin was her father. However, during her testimony, Shay admitted that Big Kevin was not her father but rather the grandfather of her son with Little Kevin and the father of her younger child from their clandestine affair after Little Kevin died.

Shay began the affair with Big Kevin in October 2017. In January 2022, she had been living with Big Kevin, her two children, and Tink. According to Shay, Tink saw Facebook messages between her and Big Kevin after Big Kevin's death and

---

[5]For judicial economy, *see* Tex. R. App. P. 47.1, we will not describe all the nonaccomplice evidence, such as the 911 calls that described the drive-by vehicle, the security-camera footage from neighboring homes that helped police track the vehicle to Durham's home, or photos of the vehicle and crime scene.

[6]Braylin complains in his second point about some of this body-camera footage, which was admitted over his Rule 403 objection.

confronted her about the affair. Shay claimed that her daughter's parentage "didn't truly get confirmed until after [Big Kevin] died" because that was when the Facebook messages between them came out. When asked whether Braylin had known about the affair, Shay stated, "If he did know, I don't know who told him and I don't know if he knew." However, she also admitted that "everybody had their suspicions."

Big Kevin's mother, Elwanda Thornton, described the relationship between Braylin and Big Kevin as "somewhat strained," because Braylin was rebellious, but Thornton said that Big Kevin had still tried to help him. The State's theory was that Big Kevin's affair with Shay was another reason for the strained relationship.

Corporal Miller's body-camera footage showed Shay on her cell phone while speaking with him; at one point, she yelled into the phone, "I don't know why he came outside!" Braylin's maternal grandmother, Deborah Ingram, also appeared at the scene and spoke with Corporal Miller. She told him, "If it was a drive-by shooting, it's probably behind my grandson Braylin . . . ," and then added, "I hope they don't come shoot up my house."

## 2. Police investigation

Fort Worth Police Detective Michael Sones was the on-call homicide detective on January 25, 2022, and collected surveillance videos that were admitted into evidence and published to the jury.

### (a) Videos and related evidence

Using security videos from neighboring homes, the police were able to identify the shooter's vehicle, which staged near Big Kevin's home for around 11 minutes before the drive-by shooting. Regarding this staging, Detective Sones testified that based on his experience setting up surveillance, he had never waited for so little time, so "[i]t jumped out immediately that that felt like a setup." Some videos had audio, allowing the jury to hear the gunshots that struck Big Kevin, and Detective Sones testified that the rate of fire indicated that the weapon was "most likely" a rifle.

Two days later, the police tracked the vehicle to Durham, who admitted to Detective Sones that she had driven it during the drive-by, named Cotton as the shooter, gave him Cotton's address, and told him that Cotton had an AR pistol.[7] She also told him that she and Cotton had used Instagram to communicate about the shooting and gave him their Instagram handles.

Within a few hours of Durham's interview, the police obtained a search warrant for Cotton's apartment. Inside Cotton's apartment, they found—among other things—an Anderson assault multi-caliber (AM-15) rifle, two cell phones, and

---

[7]"AR Pistols . . . could be considered handguns due to the lack of a shoulder stock and the short length of barrel," but they "fire the same or similar ammunition as rifle variants." Wm. Alan Bartley & Geoffrey Fain Williams, *What is an Assault Weapon? Definitions, Attributes, and Implications Regarding Legislation*, 57 Gonz. L. Rev. 515, 542 n.100 (2021/2022).

Cotton's Tarrant County Inmate photo identification. They also found an undated letter addressed from Cotton to Braylin at the jail in which Cotton stated,

> Wassup B-tch I know yo ass aint kill that hoe cuh llah nah Im just playing yo ass really a hoe llah. This my number . . . call me fool but only with the free phone call. You call collect Ima block yo ass. But nah fool Im bout to pull this heist I really wanna help yo ass get out. Call me Fool!

Detective Sones testified that from the outset, the police had known that Big Kevin was Braylin's father but had initially believed someone had killed him for revenge on Braylin. The letter's friendly tone made them rethink whether Cotton had done the shooting *for* Braylin, so they requested Braylin's jail communications record—phone and tablet[8]—and his jail money record. A year's worth of Braylin's tablet history contained over 75,000 messages, so Detective Sones "only truly dug in deeply into the month of December and the month of January," and, even then, "[i]t took days and days of reading to go through them." He compared Big Kevin's and Cotton's phone histories with Braylin's records, and when he saw Abeyta's phone number on both Big Kevin's and Cotton's phones around the time of the offense, he obtained a search warrant for her phone. From phone, tablet, and Instagram records, Detective Sones created an overarching timeline and summary of events.

---

[8]Detective Sones explained that "[p]risoners are allowed a tablet which they can purchase the access to use to send and receive messages."

**(b) Summary timeline**

The trial court admitted Durham's and Cotton's Instagram records (respectively, State's Exhibits 125 and 126) and the summary timeline (State's Exhibit 128) over Braylin's objections, addressed in part of his third point. The timeline established Braylin's communications with Abeyta, Kaelyn Harris (another of Braylin's girlfriends), Robin Rich (yet another of Braylin's girlfriends), and Jamar "Corn" Gipson (one of Braylin's friends).

Detective Sones's timeline began with Braylin's contacting Harris several times on December 16, 2021, between 4:31 p.m. and 5:23 p.m., to see if she had Cotton's phone number and to find out if Cotton was in jail and if Cotton still had "controllers." She replied that Cotton was not in jail, sent him Cotton's phone number, and stated that, as to "controllers," "[o]nly one." At 4:53 p.m., Braylin also contacted Corn to ask him how many "controllers" he had or if he could contact someone selling some. Detective Sones testified that "controller" meant "firearm," and Braylin confirmed this in his testimony.

Three days later, on December 19, Braylin directed Harris, "Tell [Cotton to] hit up KC[9] while KC out and about." When Cotton asked Harris to ask Braylin "about what," Braylin replied, "tell em kc gone tell em."

---

[9]During Braylin's testimony, he identified KC as "KC the Kid," his cousin, who "dropped" songs for Braylin while he was incarcerated.

8

Approximately three weeks later, on January 14, 2022, at 7:12 p.m., Braylin told Harris to "[H]it [Cotton]," to which she replied that Cotton's phone was turned off. At 8:42 p.m., he told her, "if I end up going to locc up IMA have Trent[10] call u n tell u what to do." At 8:44 p.m., she replied, "Yeah [Cotton] said what he need?"[11]

Four days later, on January 18, at 8:26 p.m., Braylin told Harris to tell Cotton to call her and "tell him about the play. [T]ell him I want to get ol girl n I need his help." Detective Sones and Braylin both defined "play" as a criminal act.

Harris replied that Cotton asked where "she" was, and Braylin replied, "tell him IMA set it up just chill n tell em I said we gotta get the bestfran to youno who." Braylin immediately added, "[T]ell him I said . . . we gotta be fast tho like we gotta do is asap!!! [T]ell em I'm get call tomorrow or have somebody call ask em what's a number to call rq." At 8:42 p.m., Harris replied that Cotton's phone was off but that he had sent a number to call and could still text. The next morning, at 8:25 a.m., Braylin told her to send the message but that they were going to "3way it." At 5:13 p.m. that day, Braylin told her to "text M[12] n ask when he available youno who."

---

[10]Detective Sones identified Trent as a prisoner on the same floor as Braylin at that time.

[11]Detective Sones testified that he understood some of the messages to be copied and pasted so that Harris could transfer the messages directly between Cotton and Braylin, accounting for some of the grammatical oddities.

[12]Braylin and Harris frequently referred to Cotton by "Mon," so Braylin may have abbreviated "M" here to mean Cotton.

On January 20—five days before the murder—Braylin exchanged messages with Corn between 4:58 p.m. and 8:14 p.m. to tell him "that game . . . its time to play it." When Corn asked Braylin what he needed him to do, Braylin replied, "well controllers cool" and "what's yo [C]ash [A]pp?"[13] Twenty minutes later, Corn replied, "i got that $" and Braylin told him to hold it.

Braylin contacted Harris at 8:18 p.m. to tell her that "KC and them" did not want to play but were good at that game, stating, "they gotta already be yeah in the restroom or outside at front d[oor] when the monster come out [you know]? . . . n put it in the yeah and take it to the M."[14] A few minutes later, Braylin added, "[J]ust read it same sh-t just like months bac[k]!!! [G]et it done !!! [L]ace [Cotton] up[15] !!! ask em do he wanna play the rest room version or front door."

Braylin then contacted Corn again at 8:24 p.m. about "the African game bac[k] . . . so text my lil bro[16] explain him how to play it !! with the restroom version or the

---

[13]Cash App is the second most-used digital wallet, a smartphone application. Raúl Carrillo, *Platform Money*, 41 Yale J. on Reg. 894, 894, 899 (2024).

[14]Detective Sones testified, "There's definitely some coding and then just poor spelling involved." He testified that in this sentence "M" might mean "mailbox."

[15]Detective Sones testified that to "lace up" someone meant "to fill him in, to give him all the details."

[16]Detective Sones understood this message to mean that Braylin was telling Corn to call Cotton and explain to him how to commit the murder.

wait til the African monster[17] [c]ome out the front door version." He listed Cotton's phone number and added "like ASAP its at the same spot." At 8:27 p.m., Corn replied, "I did it."

At 11:39 a.m. the next day, Braylin asked Harris to ask Cotton if he paid the bill, and she replied, "He said no." At 12:06 p.m., Braylin asked her to ask Cotton "how much more he need."[18] At 8:42 p.m., Braylin messaged Harris to ask if she had talked to Cotton.

On January 23—two days before the murder—Braylin contacted Harris at 10:42 a.m. and asked her to do what he told her before stating, "[B]ut before u do that ask [Cotton] what's that thing he said he need that cost 20[19] when he text it to u. u just text it to Corn." She replied at 1:16 p.m., stating, "Tell [B]raylin im ready im onnat." Forty seconds later, Braylin asked, "who said that?" Harris replied, "Your

---

[17]Detective Sones testified that it was clear to him from the messages that the "African monster" meant Big Kevin.

[18]Abeyta also messaged Braylin that day, but we have excluded her message because she was his accomplice as a matter of law. *See Cotton*, 2025 WL 700175, at *5, n.5 (explaining that the court may not rely upon an accomplice's out-of-court statement for corroboration and removing—from the same timeline used in Cotton's trial for Big Kevin's murder—"all social-media evidence that originated with Abeyta and Durham from our consideration of the timeline for purposes of determining whether the evidence tends to connect Cotton to the murder").

[19]Detective Sones testified that in context with later messages, the referenced item was ammunition.

11

hb[20] idk what that mean." A minute later, he replied, "a[s]k him bluecookie or the play? [N] tell him call Corn for the 20$." At 1:27 p.m., Braylin contacted Corn, stating, "lil bro need pieces that go [i]n the controller asap." Detective Sones explained, and Braylin confirmed, that "pieces" for controllers meant ammunition.

At 1:41 p.m., Braylin contacted Abeyta, asking her to contact Cotton to find out "what kind of pieces he need for the controllers when he tell u don't text it on here!!!! I just need u to go to academy n get em for me!!! IMA send u the money after you go get em." A few seconds later, he added, "n take em to him!" and then a minute later, "if you can't then I'll figure it out." At 1:46 p.m., Braylin contacted Harris again, "[N]eed some pieces to a controller!" Detective Sones testified that the messages showed that Braylin had asked Harris, Abeyta, and Corn to do the same thing—buy bullets.

We have set out the rest of the January 23 messages as follows:

- At 1:51 p.m., in response to a message from Abeyta, Braylin stated, "okay now go get em if they say you to[o] young . . which I doubt just tell Marcus[21] ride with you baby to get it !!! they like 14$ or maybe 20 idk."

- At 1:52 p.m., Braylin messaged Harris, stating, "no the pieces that go in the controller!! I need em not the controller," and then "u gotta know what kind so

---

[20]Detective Sones stated that "hb" was an abbreviation for homeboy.

[21]Detective Sones testified that Marcus was Abeyta's brother and that one had to be eighteen or older to purchase ammunition.

ask [Cotton] n then ask yungn."[22] At 2:19 p.m., Harris replied, "He said he don't got none gotta go to a store."

- At 2:21 p.m., Corn contacted Braylin to state "it's possible it could work but idk . . . n we'll talk when you call."

- At 2:25 p.m., Abeyta called Cotton.[23]

- At 4:05 p.m., Cotton received an incoming call from the Tarrant County Inmate Outgoing line, and the call lasted until 4:13 p.m. Cotton made an outgoing call to Corn's phone number and created a three-way call.

- At 4:11 p.m., Braylin messaged Abeyta to ask, "baby did you go get emmm???" and then added, "and don't text nun stupid on here but yeah."[24]

- At 6:55 p.m., Abeyta received an incoming call from the Tarrant County Inmate Outgoing line,[25] and the call lasted until 7:10 p.m. She also made an outgoing call to Cotton and created a three-way call. At 7:31 p.m., she made an outgoing call to Cotton, and that call lasted almost a minute.

- At 7:35 p.m., Cotton messaged an unknown Instagram user to say "Im literally finna be outside & im finna meet this n-gga to get these bullets I was scoping some shyt out right by ya shyt."[26]

---

[22]Braylin identified "Yungn" as Dreyon Glenn, who had sent him a text after the murder to let him know that Big Kevin had been shot.

[23]Because the act of her calling is not an out-of-court statement, it remains in the timeline.

[24]Detective Sones testified that, to him, Braylin's comment meant that he did not want a record on the tablet of Abeyta's saying that she bought bullets. We have excluded Abeyta's response. *See Cotton*, 2025 WL 700175, at *5 n.5.

[25]Detective Sones testified that per Abeyta's statement to him, Braylin was the only person in the Tarrant County Jail to whom she spoke.

[26]Braylin complains about this message's admission in part of his third point.

- At 7:41 p.m., Abeyta received an incoming call from the Tarrant County Inmate Outgoing line; the call lasted until 7:47 p.m. At 7:45 p.m., she called Big Kevin and created a three-way call.

- At 7:49 p.m., Abeyta received an incoming call from the Tarrant County Inmate Outgoing line; the call lasted until 7:57 p.m. At 7:53 p.m., she made an outgoing call to Big Kevin's phone and created a three-way call.

- At 9:41 p.m., Abeyta received an incoming call from the Tarrant County Inmate Outgoing line, and the call lasted two minutes.

On January 24—the day before the murder—Braylin messaged Corn at 1:02 p.m. to tell him "I got the pieces to the controllers foo!!! [M]an I'm frustrated." At 2:36 p.m., Cotton messaged Durham via Instagram, stating, "Lets go by that one house."[27] At 2:41 p.m. Braylin messaged Corn, "tell [Rich] fuccn text me! off Tony account!!" Three minutes later, he messaged Harris, stating, "tell em just be over there . . . watching . . . ."

At 3:53 p.m., Harris replied to Braylin that Cotton "just said ok," and at 4:17 p.m., she messaged him, "Ride at work wen they get fasho & tell [B]raylin he got me for [this sh-t] right?" Braylin replied at 5:45 p.m., stating, "tell [Cotton] I got him fashoooo." Four minutes later, Harris replied with Cotton's message, "1000% long as he got me i got him 1000%."

---

[27]Braylin complains about this message and Durham's response in part of his third point. We have excluded Durham's response for purposes of our nonaccomplice-witness evidence review. *See Cotton*, 2025 WL 700175, at *5 n.5. However, Detective Sones testified without objection that per Durham's statement to him, the murder would have been on January 24 if her car had not been out of gas. Rich also showed him her phone's Cash App activity where she paid Durham $25 on January 24, and the trial court admitted a photo of that activity.

14

At 7:19 p.m., Harris messaged Braylin, stating, "The person who pose ta take me bs if anything I need a ride." At 8:42 p.m., Braylin replied, "tell em might gotta do it tomorrow if he can't tonight."

On January 25—the day of the murder—the following messages were exchanged before the shooting:

- At 10:05 a.m., Harris messaged Braylin, "Yeah & tell em yk do ts were cuhs juss come out tryna do [this sh-t] & get paid[.] He sent that last night I forgot to send it." Two minutes later, Braylin replied, "okay tell him today fasho just be there today waiting on me, I come out at 4."[28]

- At 10:16 a.m., Harris messaged Braylin that "if ol boy don't got a car he really just need to give that thing to me so whenever the n-gga do pull up or anything I can just do it myself yk?" Braylin told Harris, "yeah but nah sticc to plan."

- At 10:50 a.m., Rich messaged Braylin to tell him to return her money "back on [C]ash [A]pp thank you."[29] He replied a minute later to tell her, "OK I am today."

- At 1:17 p.m., Braylin messaged Harris stating, "I needa call u! to talk to em."

- At 4:51 p.m., Abeyta received an incoming call from the Tarrant County Inmate Outgoing line that lasted until 5:05 p.m.

- At 4:53 p.m., Abeyta made an outgoing call to Big Kevin's cell phone that lasted until 4:54 p.m. and at 4:53 p.m., she also made an outgoing call to create a three-way call, which lasted until 5:05 p.m.

- At 4:55 p.m., Abeyta received an incoming call from Big Kevin's cell phone that lasted until 4:56 p.m.

---

[28]Detective Sones testified that the murder had to happen after 4 p.m. because before 4 p.m., Braylin would not have been available to make phone calls.

[29]Detective Sones testified that per Durham's interview, she had received $25 via Cash App from Rich, and he interpreted Rich's message to mean that she wanted her $25 back from Braylin.

Detective Sones testified, "[W]e believe we see [Big Kevin] making that phone call from the mailbox." The surveillance video supports this observation, showing Big Kevin's dialing his cell phone while leaning on the mailbox immediately before the drive-by shooting.

After the shooting, at 5:01 p.m., Abeyta made an outgoing call to Cotton, but the call did not go through because Cotton's phone was turned off; at 5:05 p.m., Abeyta and Braylin ended their phone call. At 5:06 p.m., Abeyta received an incoming call from the Tarrant County Inmate Outgoing line, and this call lasted until 5:21 p.m. At 5:10 p.m., she made another call to Cotton's phone, which was still turned off.

At 5:19 p.m., Cotton called Abeyta, and she created a three-way call that lasted until 5:21 p.m. At 5:29 p.m., Harris messaged Braylin, "I just put some on here for you ima do the rest and put more when I get off gotta go to the bank again[.] Tell [B]ray the party was lit & im tryna get a lil some for that cant cap a n-gga need it & ima go scope that one play out to."

At 6:31 p.m., Braylin messaged Harris, "text this to [T]weet"[30] and then added, "damn . . . they saying my daddy just got shot ina head cuz shit crazy out hea." At

_____

[30]Braylin identified Tweet as Adrian Robinson, his co-defendant in another murder case. *See Robinson v. State*, No. 02-22-00265-CR, 2023 WL 4780547, at *1 (Tex. App.—Fort Worth July 27, 2023, pet. ref'd) (mem. op., not designated for publication) (recounting that Braylin, Tweet, and another man had borrowed a vehicle to conduct multiple shootings on January 12, 2020).

7:40 p.m., Braylin messaged Harris, "yes baby girl, text this to [T]weet" and then added "damn cuz my daddy just got pronounced dead cuz sh[-]t crazy."

On January 26, 2022—the day after the murder—Braylin told Corn at 8:24 a.m. to make a post on his social media, including what music to include. He then added, "cuz on Kevin im coming home I love you [C]orn cuz." Detective Sones testified that this appeared to be Braylin's managing his social media response to Big Kevin's death and that Braylin appeared to believe that he was going to get out of jail because his father had died. The next day, at 12:05 p.m., Braylin messaged Corn, stating, "need yo help cuz . . . need a new controller for a new game." A few seconds later, he added, "the Last game was great . . . just the controller ain no good."

Detective Sones described Abeyta's role as facilitating Braylin's ability to purchase bullets, to contact Cotton before and after the shooting, and to call Big Kevin—how Braylin had maneuvered Big Kevin to the mailbox at the right time so that Cotton could shoot him. Detective Sones testified, without objection, that he had obtained Braylin's arrest warrant because "the evidence shows that Braylin Brown planned and then facilitated the murder of his father" by providing gas money for the drive-by vehicle, by ensuring the gun had bullets by telling someone to buy them and give them to the shooter, and by masterminding the murder.

17

**B. The State's guilt–innocence case—accomplice testimony**

**1. Ashlynn Durham**

Twenty-one-year-old Durham testified that she met Cotton in 2020 through Instagram. He had an AR pistol that he carried around everywhere. She became familiar with Braylin in November 2020 because he and Cotton had grown up together and from his songs—Braylin's rapper name was "Crazy Boy Bray".

On January 24, 2022, Cotton texted her for a ride to the house where the shooting occurred, but she woke late, and her car was out of gas. She agreed to take him there the next day, and Rich[31] sent money to her Cash App. The trial court admitted into evidence Rich's Cash App records, which showed that Durham was paid $25. After receiving the money, she put gas in the car and picked up Cotton.

Durham testified that she saw the victim for the first time when he walked to his mailbox. After the shooting, she dropped Cotton off and went home. Cotton told her later that Braylin paid him $2,000 or $3,000 "to kill a man" who she "later found out . . . was [Braylin's] dad" based on "[s]omething about the dad was messing with a girlfriend or something like that." Less than a week after the shooting, the police came to her home, and she told them everything. She had been threatened about testifying, and the trial court admitted some messages that her sister sent her on Facebook

---

[31]Durham testified that Cotton knew Rich through Braylin.

18

warning her about Cotton and Braylin. Durham's sister's message told her that Braylin had put a hit on her for $3,000 and that Cotton was also trying to have her killed.

During cross-examination, Durham denied that the first time she had mentioned Cotton's getting paid $3,000 by Braylin was five days before trial and insisted that she had told prosecutors before then.

## 2. Alexis Abeyta

Twenty-two-year-old Abeyta testified that she and Braylin grew up together. Their romantic relationship ended in 2021 when he went to jail. While he was in jail, they communicated via phone or through his tablet, for which she put money "on his books" monthly. She knew he was talking to other girls, including Rich and Harris.

Abeyta arranged three-way calls for Braylin with Big Kevin, with Tink, and with Braylin's grandmother while he was in jail. When the other party joined the call, she would put her phone on mute but would periodically check to see if she could still hear them talking.

Abeyta testified that Braylin had been very close to Little Kevin and that she knew of Braylin's being close with Big Kevin. However, when asked if Braylin had ever indicated to her that he had a bad feeling about Big Kevin, she testified, "Well, one day . . . he had told me that his dad was very grimy. This was like months before the accident or whatever." She explained that "grimy" meant, "like dirty, like backstabbing." She initially testified that she did not know why Braylin told her this about Big Kevin. However, she testified on redirect as follows after stating that

19

Braylin had not reacted the way she thought one would when learning about a parent's death:

Q. You had mentioned before that Braylin told you that his dad was grimy. Did you believe that that had something to do with it of why he wasn't feeling emotional about his dad's death?

A. Yes, ma'am.

Q. And do you know why Braylin thinks his dad is grimy?

A. Yes.

Q. Why?

A. . . . he had told me about his dad with the relationship -- with Kevin of the relationship with some girl named Shay they had going on, [Little] Kevin's baby momma, and he had -- the dad had a baby with Shay.

Q. So Big Kevin and Little Kevin both had a baby with Shay?

A. Yes.

Abeyta stated that after Braylin asked her to buy bullets ("pieces to the controllers") at Academy, she did so. Braylin's plan had been for her to meet Cotton, whom she had not met before, to give him the bullets, and she did so right after buying them. After giving the bullets to Cotton, Abeyta continued to communicate with Braylin via tablet and phone.

On January 25, Abeyta called Big Kevin on a three-way call with Braylin and then put them on mute. When she checked to see if they were still on the line, she heard Braylin ask Big Kevin to go to the mailbox to see if his chains or grills were there and heard them talk about grills and money for lawyers and bond. She then

20

called Cotton on a three-way call at Braylin's direction. Abeyta stated that she did not listen to the conversation and did not find out until later that it had taken place immediately after the shooting.

After Abeyta was arrested and while she was in jail, Braylin sent her a letter through "in-house mail." In the letter, Braylin told her that he loved her, would clear her name by talking to the detectives, and would help her get bond. She considered the letter Braylin's apology for getting her involved in Big Kevin's murder and his admission that he was a part of it. Braylin had told her not to cooperate with the police, and she had been frightened to testify.

## C. The Defense's guilt–innocence case

Braylin, who was twenty-two years old at trial, testified that he had lived with Big Kevin until he turned fifteen, and while he was in high school, Big Kevin, who "[n]ever really did have a job," helped him change VIN numbers on stolen cars to make them "legit." At fifteen, Braylin was sent to the Texas Juvenile Justice Department (TJJD),[32] where he met Cotton and became serious about his music. When he was released, his first song went viral, "like a hundred thousand views," and he found a music manager.

Braylin agreed that the exchange of messages in the State's case was accurate but claimed that on January 25, Cotton was not supposed to kill Big Kevin but rather

---

[32] Braylin testified that he was sent to TJJD the first time for burglary of a vehicle and the second time for aggravated assault with a deadly weapon.

to put a Glock in the mailbox because Big Kevin had been helping Braylin sell guns and jewelry to make bond. He also stated that while he was in jail, it was common for women to set up three-way phone calls for him and for him to ask them to send money to others for him.

Braylin testified as follows about being on the three-way call with Abeyta and Big Kevin before the murder, stating,

> I told [Big Kevin], today my little pardner going to be bringing Glocks, so make sure you go check it. But I didn't say Glock, I said grills. That was the key word. I was, like, make sure you do that. I talk to my daddy a few days before anyways to let him know that, to make sure you check your mailbox, it's going to be in there, get it, do what you got to do, sell it, and that was that.

When asked about the "African monster" in his messages, Braylin replied that he had used that label to refer to "Mohammed," a scam artist on Instagram. Braylin had heard that Mohammed liked beautiful women, so he "tried to put [Abeyta] on him" so she and Braylin could rob him. When that did not work, he "sent [Harris], some reason it worked, so [Mohammed] just started texting," and "within a few days, she was able to get him over to our house." His plan had been for Cotton or someone else to be waiting in the restroom or to "catch him coming outside to take him back to his place and get [Mohammed's] money," but that plan was not successful.

During cross-examination, Braylin stated that he told Abeyta to buy ammunition and then to meet with Cotton because Cotton "needed ammunition . . . for plays." One of the plays involved Mohammed, but there were others as well.

22

Braylin stated that "[e]very day is a play" and that he had been involved in several plays because he needed bond money.

Braylin agreed that he was the only connection between Big Kevin and Cotton, but he claimed to have no idea why Cotton would shoot Big Kevin in the head right after Big Kevin spoke with Braylin on the phone; he denied that he had heard the gunshots; and he denied having paid Cotton to kill Big Kevin. He spoke with Cotton immediately after the shooting "[t]o ask him did he give [Big Kevin] the Glock. He said he didn't go. He said he just did another play" and that he needed to get rid of the gun because it was "dirty."

Braylin said that when he spoke with Cotton at visitation, Cotton denied having killed Big Kevin. He told Cotton to confess if he had killed Big Kevin and that he would get Cotton out, but he admitted, "I had it on my mind, once I get him out, I was going to smoke him, if you want . . . me to be honest on the stand." He then confirmed that he meant he would kill Cotton but asserted, "I don't kill innocent people," before then denying that he had ever killed anyone.

Braylin claimed that he did not know about Big Kevin's relationship with Shay before Big Kevin's death. During cross-examination, he denied having testified during his bond hearing that he knew about their relationship before the murder. The prosecutor then asked to play one of Braylin's songs, "Criticizing," asserting that Braylin had opened the door by stating that he was as rapper. Braylin's defense counsel objected under Rules of Evidence 403 and 404 and asserted that he had not

23

opened the door because the State had introduced through Durham that Braylin was a rapper.

The trial court overruled the objections and allowed the prosecutor to question Braylin about his song.[33] When the prosecutor asked Braylin what the song was about, Braylin replied,

> Criticizing is a song -- everybody -- at this point, it was mostly my father's death. My father is not the only person that Fort Worth has said that I got killed from jail. So some people tried to say it is because of this and because of that. It's just -- it's just so many accusations. So in this song there is some lies in this song, there is some truths in this song, Criticizing.
>
> And I just -- I mean, it's really not much meaning unless I interpret the lyrics.

Braylin explained that he had been able to record the song over the phone while in jail and had released it in March 2022 while incarcerated.

Braylin recited the following lyrics, and the trial court allowed the State to publish the 3-minute, 44-second song to the jury. To highlight the distinction between lyrics and Braylin's testimony, we have placed the lyrics in boldface, followed by his testimony about each one:

- "**I talked to Man on the phone. . . . Don't know if I still feel alone. I been offered five years. Don't know if I really want to take it**."

Braylin asked the prosecutor, "Have you ever offered me five years?" The prosecutor said no, and Braylin held that out as an example of the song's lies. He

---

[33]In his first point, Braylin challenges the lyrics' admission.

explained that he had lied about the offer in the song because he wanted to keep his fans believing that he would see freedom again, stating, "this song is a publicity song."

- "**My little sis shed tears, she mad at me, I hope she make it.**"

Braylin stated that he wrote this line because after Tink "told [him] [Big Kevin] had a baby with [his] brother baby momma, at first when she told [him] that, [he] was mad." He denied that Tink thought he had killed Big Kevin because of Big Kevin's relationship with Shay.

- "**Word around the street n-ggas saying Crazy Boy got a new charge.**"

Braylin explained that people had been alleging that he had murdered his cousin Jaden Williams, Williams's friend Rashad Johnson,[34] and even his own mother. He stated, "[W]hen you somebody in Fort Worth, everybody gossip."

- "**I don't got the S word to get off my D word. Just know that I'm coming hard.**"

Braylin explained that he felt like he was "hard for [his] music."

- "**The last n-gga that played me, his pussy ass got found in the yard.**"

Braylin explained that he was not referring to Big Kevin in this lyric but rather to "J-Dub,"[35] a rapper he had been "beefing" with because J-Dub had shot up Braylin's mother's house "a couple of times." J-Dub's body was found in his yard, but Braylin said that "[s]ome dudes that got convicted" had killed him. Part of the beef

---

[34]The State presented evidence regarding Johnson's murder during punishment.

[35]During the punishment trial, J-Dub was identified as Javien Wright.

25

had to do with their various gang memberships. Braylin said that he had been in a gang but that he was no longer, having given his life to God.

- **"R-I-P, K-B, my father for doing what he did."**

Braylin said he put this in the song because Big Kevin had been wrong "for having a baby with his, you know, that situation."

- **"Don't be mad at me, be mad at your pops for what he did."**

Braylin stated that the line at the song's end about being mad "at your pops," was directed to Tweet, whose father would not bail Tweet out.

## D. Punishment Evidence

In the punishment phase, the State offered, and the trial court accepted into evidence, a certified copy of Braylin's 2018 order of commitment to TJJD for aggravated assault with a deadly weapon, as well as his stipulation to that exhibit. Witnesses then testified about Braylin's gang involvement and his involvement in three shootings—a shooting at the Como Food Mart on December 27, 2019; a January 6, 2021 shooting of a house; and the January 11, 2021 shooting of Johnson. The State also reoffered all of the guilt–innocence evidence, and the trial court accepted it "subject to any objections and any rulings on the objections [that] will remain the same."[36]

---

[36]Braylin presented punishment evidence, but none of his evidence relates to this appeal. Thus, we will not discuss it.

## 1. Gang unit testimony

Fort Worth Police Officer Christopher McAnulty, a member of the gang unit, testified about Braylin's gang, which was a Crips subset. He agreed that it would be "fair to say that the entire Fort Worth gang unit is largely familiar with" Braylin, a documented gang member since April 2019. There was a well-documented conflict between Braylin and J-Dub, a member of a Bloods subset, on social media. The trial court admitted into evidence photos of Braylin's gang tattoos and his tattoos memorializing Little Kevin.

Snippets from Braylin's Instagram account were admitted in State's Exhibits 168–172 over objections that Braylin does not raise on appeal. One post from Crazyboybray's Instagram says, "Free tweet cuzzzzzzzz," and "fucc the Rats on 60![37] He stayed next to me in every video And in real life," and contains a link to one of Braylin's videos. Officer McAnulty testified that at the time of the post, Tweet had been arrested for murder.

Another post says, "On Crip lil loco & Trent was already watching his weird ass . . [.] on my mama if I would of told em to do u lame ass N-gga 100% they would of! We ran the county! On60." Officer McAnulty identified Trent as a documented

---

[37]Officer McAnulty explained that to say "on" meant "the most important thing in my life," and gave examples of "on my mom" and "on 60" to mean that Braylin was saying something that he wanted people to believe. He stated that as to "on 60," Braylin was "saying on my gang, on the Rollin' 60 Crips." He stated that "rats" is "a common street term for people that are snitching or talking to law enforcement."

27

gang member who had been convicted of murder. He opined that at the time of the post, Braylin had believed that Leontye Willis, a witness in another case, *see Robinson*, 2023 WL 4780547, at *2, was cooperating with law enforcement and that Braylin had urged retaliation against him. The next two posts included a photo of Braylin and Leontye and Braylin's profane rants about Leontye's purported betrayal.

State's Exhibit 173, admitted without objection, is one of Braylin's music videos, in which both Tweet and Leontye appeared, and in which Braylin referenced J-Dub and retaliation, and multiple firearms were displayed. In the video, Braylin wears a heavy necklace with the word "Loyalty" set out in crystal. Officer McAnulty testified that the song's name was "Bad Ass (J-Dub Diss)."

### 2. January 6, 2021 shooting

Fort Worth Police Officer Colton Holland responded to a January 6, 2021 call involving a sixty-four-year-old woman who had been shot in the arm. The victim, who was sixty-six years old at trial, testified that she had been staying with her son at his house when someone shot at the house. Her son's girlfriend's son was Daevion Williams, nicknamed "Dwill," and the victim believed that the shooting had to do with him and was in retaliation, even though Dwill was not living there. The rifle used in the shooting was found ten days later during the January 11, 2021 shooting investigation.

Fort Worth Police Detective Daniel Koplin testified that when he was assigned to investigate the January 6, 2021 shooting, other detectives identified Braylin as a

28

potential suspect. He verified that Braylin and Dwill had been suspects in the same offense in 2017, when they were juveniles; that Dwill had been arrested the day of the offense but Braylin had not been arrested until months later, giving rise to Braylin's belief that Dwill had snitched on him; and that Braylin had gone to TJJD for the offense. Detective Koplin was also familiar with Braylin from a December 27, 2019 shooting case at the Como Food Mart,[38] which had led to the gang unit's keeping tabs on Braylin as a "prolific offender."

A January 6, 2021 surveillance video of the home showed two individuals approach the house and fire at it. Detective Koplin testified that the two suspects at the time had been Braylin and Kejuan "Santana" Sadler. His investigation located multiple 9-mm casings from the house's north side and three .223/5.56 rifle casings on the house's east side, where the victim had been when she was injured. At the time, Braylin already had multiple active arrest warrants when he was located at a Dallas apartment on January 16, 2021, and from that date—when he was arrested— he had not been released from jail. Detective Koplin interviewed Dwill on March 13, 2021. Although Dwill was not a cooperative witness, he identified Braylin as someone who had threatened him over social media and had threatened to hurt his family—a threat that he received on January 6, 2021, the day of the shooting.

---

[38]The store's surveillance video showed the shooting and allowed police to identify Braylin and Tweet.

State's Exhibits 296–304, Braylin's Facebook records, were admitted over

Braylin's hearsay and authentication objections, about which Braylin complains in part

of his third point:

- State's Exhibit 296, a Facebook post from November 21, 2020, states that the author is Braylin, and states, "Ain't Sh-t to talk about oncrip cuz you don't know me . . . on my dead mama like I told dwill pussy ass N-ggas betta stop Lyin on my name had that boy running from me n-gga on 56!!!! He snitched on me !!!![39] Tf u talm bout! N gone say I ain't no steppa yeah[.] Fasho lemme show u on my dead brother N-gga on tweet it's pressure."

- State's Exhibit 297 is an Instagram "message thread" dated January 6, 2021, between the crazyboybray and southsidelilgreg[40] accounts. Southsidelittlegreg tells crazyboybray, "n-gga just be talking" and "He know if he had beef with us will flip his ass." Crazyboybray replies, "On Crip we gone get em tomorrow," "Ima link with u n FaceTime him," "N say come rap," and "When he pull up it's a rap on 60."

- State's Exhibit 298 is a screenshot of an undated message thread. Detective Koplin testified that it was between Braylin's Instagram account and Westcide_dwill. The message begins, "Meet right now. Make sure you here cuz. bring ya gang," to which Westcide_dwill replies, "Bih ahh nigha stop typing." The respondent answers, "I'm knowing you cappin." Westcide_dwill replies, "Make sure you at the park not Greg n em."

- State's Exhibit 299 is another January 6, 2021 Instagram message thread between Southsidelittlegreg and Crazyboybray. Southsidelittlegreg asks, "What he mean cuh," to which crazyboybray replies, "Rhance nem otw," "Rn," "Him & Santana," "To Harvey." Southsidelittlegreg responds, "He want smoke[41] with us you finna

---

[39]Detective Koplin interpreted the post to mean that Braylin believed Dwill had snitched on him during the juvenile case.

[40]Detective Koplin testified that Southsidelittlegreg was Greg Williams, a documented gang member and one of Braylin's known associates.

[41]Detective Koplin testified that "smoke" is a common term that criminals use in violent offenses when there is going to be a fight. During cross-examination,

30

make me dm him wya." Crazyboybray replies, "Ina hood & hell yeah it's smoke!" Southsidelittlegreg responds, "Cet." Crazyboybray then begins two video calls, after which he states, "Like nun neva happen." The message thread ends with southsidelittlegreg stating, "Crip."

- State's Exhibit 300 is a December 23, 2020 Instagram thread in which crazyboybray messaged lblock.k5, stating, "Ain't no beef cause I love u, u the reason I ain't kill dwill when I came in there cuz but stay out this shit cause I'm comin !!!!" Lblock.k5 replied, "I love u to boy." Detective Koplin interpreted it to mean that Braylin "had an opportunity to kill [Dwill] in the past or around that date, decided not to because of somebody else's interjection, but he's still telling said person, I still plan to do this."

- State's Exhibit 301 is a January 6, 2021 Instagram message thread between crazyboybray and 448greedygangbando in which crazyboybray states, "I wanna slide," which Detective Koplin explained—as used by gangmembers—meant "they're going to commit a violent offense, that being robberies, shootings, murders. Slide is kind of a general term for committing violence." 448greedygangbando "liked" crazyboybray's message but tells him that he is "on the monitor."

- State's Exhibit 302 is a screenshot of an Instagram message from Tweet, stating, "tell cb I Jus's talked to dwill . . otp but tell him tonight he should be at papa spot and inna am he gone be there to . . tell them to handle up and he at his mama house rn." Detective Koplin testified that "[s]omehow [Tweet], whether directly or indirectly, got th[e] information to Braylin" about where Dwill and his family would be.

- State's Exhibit 303 is an undated photograph of an AK-47 and two Glock handguns found on Braylin's Instagram. Detective Koplin stated, "Yes," when asked whether he saw photos of many guns throughout Braylin's Instagram and Facebook records.

- State's Exhibit 304 is a January 7, 2021 thread between dman_3oo and crazyboybray. Dman_3oo asks crazyboybray, "Do 350?" He replies, "Yeah idc" and "& c safe I love u hoe on kb." Then a video call starts between them before

---

Detective Koplin agreed that "going to smoke" could mean smoking marijuana but that it depended on context, and in the context of the rest of this message thread, it meant going after someone violently.

dman_3oo replies, "Love yuh mo." Crazyboybray replies, "2200 Aden rd," and another video call begins before dman_3oo states, "10 mins." Detective Koplin translated the message as Braylin's selling a Glock handgun, for which the other party offered $350, and Braylin replied, "Yeah, I don't care."

Detective Koplin testified that he obtained an arrest warrant for Braylin for engaging in organized crime (aggravated assault-retaliation) based on witness statements, the social media materials, and the rifle, which had been used in the offense and which was found at Braylin's apartment ten days later. He also testified that he "spent three straight weeks doing nothing but going through the social media for Braylin Brown, his phone, Facebook and Instagram."

### 3. January 11, 2021 shooting

Fort Worth Police Detective Joey McAnally testified that she had investigated Braylin for the homicide of twenty-three-year-old Rashad "Doodie" Johnson, which occurred on January 11, 2021.[42] The police located surveillance video of the shooting, which was admitted into evidence and published. The surveillance video showed that Johnson arrived home in his old white Sentra, and then a silver Charger arrived. He spoke briefly to someone on the Charger's driver's side before a shot was fired; he then took off running for his yard, fired back, and fell to the ground.

Johnson was found dead on his home's doorstep. His cousin Dale Taylor, who did not want to testify and said that the prosecutor had "kind of, sort of" forced him

---

[42]Braylin was indicted for Johnson's murder on March 23, 2023.

to be there, stated that Johnson had associated with Jaden Williams,[43] and he agreed that, right after the shooting, "the street" started talking almost immediately about who was responsible, sending him texts and a video. He said that the video was of some guys who he did not recognize riding in a silver Charger. The video—State's Exhibit 309—was admitted and published to the jury. Detective McAnally identified Santana as the front seat passenger, Braylin as the backseat passenger, and Jesus Gomez,[44] one of Braylin's co-defendant's in Johnson's murder, as the driver.

Gomez testified that in January 2021, Santana contacted him through Instagram, and he drove from Austin to Fort Worth, arriving around 10 or 11 p.m., and picked up Santana, who was wearing a pistol. Santana sat in the front passenger seat and gave him directions to pick up Braylin, who also had a pistol. Braylin sat in the backseat, on the driver's side, and Gomez raced a girl, who recorded them in State's Exhibit 309. The video shows Braylin, throwing gang signs and wearing a distinctive ring.

---

[43]Detective McAnally testified that she reviewed Johnson's social media after the shooting and "quickly learned that he was a good friend of Jaden." She also testified that her understanding was that Jaden had been a target of Braylin's because he had implicated Tweet in a murder. She also learned that Braylin had been looking for Johnson because he could not find Jaden. Third-hand, she learned that Jaden had been threatening Braylin's family.

[44]Gomez had been sent to TJJD for aggravated robbery when he was fifteen and while there, he became friends with Santana, who was in TJJD for manslaughter, and became a fan of Crazy Boy Bray's music and videos. Gomez was released from TJJD in 2020.

After racing, Braylin gave Gomez directions, and they pulled up to a white car as a man was getting out; Braylin told Gomez to pull over. Braylin rolled down the window and talked to the man for 25 to 30 seconds before Gomez heard gunshots behind his ear, panicked, and stepped on the gas. After the shooting, Braylin gave him the address of a Dallas apartment. Gomez joined Braylin and Santana briefly in the apartment before heading home.

While Gomez was in the apartment, he overheard a Facetime conversation between Braylin and a woman. When asked whether what the woman said gave him an impression "about what had just happened immediately after it happened," Gomez said "Yes," and the trial court overruled Braylin's hearsay objection after the prosecutor argued present sense impression.[45]

Regarding the Facetime exchange, Gomez testified as follows:

Q. (Prosecutor) What did she say?

A. She had said she was, like, Crazy Boy Bray, Doodie just got shot. And she was, like, you better not have nothing to do with it.

Q. Okay. So what did he respond?

A. I don't think he said nothing. He just hung up on her.

Q. So she said Doodie just got shot, you better not have had anything to do with it?

A. (Moving head up and down).

Q. Did you know who Doodie was at the time?

---

[45]In his fourth point, Braylin complains that this was error.

34

A. No.

Q. And approximately how long was this after the shooting had occurred?

A. Probably, like, 30 minutes, I want to say.

Q. Basically as long as it took from you to get to Fort Worth to Dallas?

A. Yes.

During cross-examination, Gomez then testified as follows:

Q. So this conversation that you overheard of a female saying Doodie just got shot, this happened 30 minutes, give or take, after the situation, correct?

A. Yes.

Q. All right. So it's not like she was observing it right then and there, correct?

A. Yes.

Taylor, whose Instagram handle was Real Young Dale, received a message on Instagram from crazyboybray shortly after the shooting. The message stated, "Since y'all talkin to much let's just meet on Crip. Hit me when u see this." During his testimony, Taylor refused to interpret the message as threatening, denied that he had told law enforcement that he took the message to be threatening, and said that he did not respond to the message.

In the Johnson murder investigation, Detective McAnally obtained a warrant to search the Dallas apartment where Braylin had been living with a girlfriend and Santana. Braylin had been on bond for murder at the time. He and Santana were

35

found at the apartment and arrested. Under the coffee table, police found the AM-15 rifle linked to the January 6, 2021 shooting.

Detective McAnally seized Braylin's and Santana's cell phones and obtained search warrants for the phones and their Instagram accounts. The trial court admitted into evidence images and conversations that she found on Santana's Instagram, including a photo of Santana with Braylin in the background holding a gun and wearing the same distinctive ring from the video in State's Exhibit 309 and a January 16, 2021 Instagram thread from Gomez to Santana—five days after Johnson's murder—with a video showing that Gomez's uncle, who owned the Charger, had done something to the area where Braylin had been sitting, with the comment, "Bro my uncle fuccing witt [B]rae shit." Detective McAnally testified that she had probable cause that Braylin had committed Johnson's murder based on the phone and social media records, the witnesses, and the surveillance video, all of which identified Braylin as the shooter.

## III. Sufficiency

In his fifth point,[46] Braylin asserts that the evidence is insufficient to support his conviction because he was in jail when Cotton shot Big Kevin and that the links were insufficient to prove that he acted as a party.

---

[46]We address sufficiency first because, if sustained, it would provide Braylin the greatest relief. *See* Tex. R. App. P. 43.3; *Roberson v. State*, 810 S.W.2d 224, 225 (Tex. Crim. App. 1991).

## A. Standard of review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608; *see Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) (explaining that the factfinder "is entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because he has the opportunity to observe the witness's demeanor and appearance").

In contrast, we do not use the *Jackson* standard when determining if accomplice-witness testimony is sufficiently corroborated. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (explaining that the statutorily imposed accomplice-witness review "is not derived from federal or state constitutional principles that define . . . sufficiency standards").[47] The Legislature has determined that accomplice testimony inculpating another person should be viewed with a measure of caution because accomplices—seeking to avoid punishment or shift blame—may lie. *Hernandez v. State*, 585 S.W.3d 537, 549 (Tex. App.—San Antonio 2019, pet. ref'd).

An accomplice witness is one who participates with a defendant before, during, or after the commission of a crime with the requisite mental state, and a co-indictee for the same or a lesser-included offense is an accomplice as a matter of law. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). The trial court identified Abeyta and Durham as accomplices as a matter of law. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (requiring corroboration); *State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016).

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Malone*,

---

[47]Neither party acknowledges the distinction.

253 S.W.3d at 257. The corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself, *id.*, nor directly link the accused to the offense's commission, *Ambrose*, 487 S.W.3d at 593. Rather, the direct or circumstantial corroborating evidence must show that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Smith*, 332 S.W.3d at 442.

We judge the sufficiency of nonaccomplice evidence according to each case's particular facts and circumstances. *Malone*, 253 S.W.3d at 257. We do not construe the nonaccomplice evidence de novo but instead defer to the factfinder's resolutions. *Smith*, 332 S.W.3d at 442.

## B. Analysis

The State's nonaccomplice guilt–innocence evidence showed that

- Braylin and Big Kevin had a "somewhat strained" relationship that might have been rooted in Big Kevin's clandestine affair with Shay and Braylin's loyalty to Little Kevin;

- Big Kevin died at his mailbox in a drive-by shooting conducted by Cotton, someone with whom Braylin had a friendly and crime-related relationship;

- the drive-by vehicle was staged near Big Kevin's home for approximately 11 minutes, indicating that the drive-by was a set-up;

- Shay did not know why Big Kevin had gone to the mailbox, but Braylin's phone and tablet records, when cross-referenced with the phone histories of Big Kevin, Cotton, and Abeyta and the relevant Instagram records, explained why Big Kevin went to the mailbox and showed Braylin's involvement in planning his father's murder, including that:

    o In mid-December 2021, Braylin contacted Harris to get in touch with Cotton and to find out from Corn and Cotton about available guns;

39

o   Braylin planned crimes and criminal strategies from jail and used code names for guns and bullets;

o   Braylin used his girlfriends to arrange for money for Cotton's bullets for the shooting, for the purchase and delivery of the bullets to Cotton, and to send gas money to Durham, Cotton's driver; and

o   Braylin was part of a three-way call with Big Kevin and Abeyta at the time of the murder and then part of a three-way call between Abeyta and Cotton immediately after the murder.

The direct and circumstantial nonaccomplice evidence set out in our guilt–innocence recitation shows that rational jurors could have found that Braylin was sufficiently connected to Big Kevin's murder. *See Cotton*, 2025 WL 700175, at \*6–7; *see also Smith*, 332 S.W.3d at 442. The accomplice testimony merely added clarification, as did Braylin's own testimony, any portion of which the jury was entitled to believe or disbelieve. *See Valtierra*, 310 S.W.3d at 447. We overrule Braylin's fifth point.

## IV. Evidentiary complaints

In his remaining four points, Braylin complains that the trial court abused its discretion by admitting into evidence (1) his rap lyrics; (2) several minutes of Corporal Miller's body-camera video; (3) some of the social media records; and (4) Gomez's Facetime testimony.

## A. Standard of review

We review the trial court's decision to admit evidence, as well as its decision on whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727,

40

736 (Tex. Crim. App. 2010). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.*

Many of Braylin's evidentiary challenges were raised under Rules of Evidence 403 and 404(b). Under Rule 403, the trial court may exclude relevant evidence[48] if its probative value "is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Rule 403 is a rule of judicial economy that "excludes otherwise relevant evidence when the costs of admission outweigh its utility." *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024). Rule 403 favors the admission of relevant evidence over its exclusion. *Hall*, 663 S.W.3d at 34. Delay from the time needed to develop the evidence includes any testimony introduced regarding the evidence, including cross-examination, redirect examination, and any defense rebuttal. *Hart*, 688 S.W.3d at 893. The "unfair prejudice" question asks whether the evidence has a tendency to suggest decision on an improper, usually emotional, basis. *Id.* at 894.

Under Rule 404(b), evidence of a crime, wrong, or other act is not admissible to prove the defendant's conformity with character but "may be admissible for

---

[48]Relevant evidence is that which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Martinez*, 327 S.W.3d at 736–37 (citing Tex. R. Evid. 401). Evidence does not need to prove or disprove a particular fact by itself to be relevant under Rule 401; it is sufficient if the evidence provides even a small nudge toward proving or disproving a fact of consequence. *Hall v. State*, 663 S.W.3d 15, 31 (Tex. Crim. App. 2021).

another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b).

## B. Rap lyrics

In his first point, Braylin complains that the rap lyrics' introduction during his trial's guilt–innocence phase was an abuse of discretion because they were not relevant under Rule 404 and because their probative value was substantially outweighed by the risk of unfair prejudice under Rule 403. He contends that he did not dispute that he was unhappy about Big Kevin's relationship with Shay; that his references to a pending charge for Johnson's murder were not otherwise admissible or relevant during guilt–innocence; and that the State spent 26 of its 45 pages of his cross-examination on the lyrics and played the song's 3-minute-43-second recording, making over half of his cross-examination related to the extraneous evidence.

### 1. Applicable law

Braylin refers us to *Hart*, a capital-murder case in which the Court of Criminal Appeals addressed the use of rap videos at trial. *See* 688 S.W.3d at 887. *Hart*'s single issue was whether the defendant had understood that he was driving a group to commit a robbery and murder. *Id.* at 892. The trial court abused its discretion by admitting rap videos during guilt–innocence to show his character and sophistication when the videos' probative value was outweighed by "the overwhelming potential for prejudice and confusing the issues." *Id.* at 887. Despite finding harm, reversing the conviction, and remanding for a new trial, however, the court declined "to draw a

42

bright-line rule that all artistic expression should always be excluded from a criminal proceeding unless it is a truthful narrative of the offense." *Id.* at 898.

In *Hart*, the State had moved to introduce "character evidence" or evidence of the defendant's "level of sophistication" through "YouTube rap videos 'relat[ing] to his ability to understand what people are communicating to him and form his own opinions about things'" after the defendant testified that he had no idea his passengers planned to commit a robbery or murder. *Id.* at 887–88. The first video showed three cartoon cough syrup bottles affixed with cartoon faces and depicted the name of the song "I.W.T." (I Won't Tell) and the defendant's rap name, "Block Da Foo Foo." *Id.* at 888. The second video depicted the defendant within a dancing-and-singing crowd, "rapping the lyrics[,] which make references to weapons, cough syrup, and being a 'trap king.'" *Id.* at 888–89 & n.3 (explaining that a "trap king" is "an exuberant drug dealer that hones a legendary street stature"). The defendant objected to relevance, because the State never proved that he wrote the lyrics or that it was his voice in the second song, and under Rule 403, because of the songs' prejudicial effect as "a glorification of criminal activity, including guns and drugs and violence," but the trial court admitted them. *Id.* at 887–89.

After the defendant denied owning any guns, the State introduced over his relevance and prejudice objections additional rap lyrics and photos posted on Facebook that referenced guns. *Id.* at 889–90. The defendant explained that the posts were either other people's lyrics or slang that he did not intend to imply weapon

possession. *Id.* at 890. The defense closed its case after calling the defendant's mother to testify that he had spent significant time in remedial courses, that he was bullied as a child, that he often did not understand others' intentions, and that he was eager to please people. *Id.* The jury found him guilty and sentenced him to life without parole. *Id.*

The court concluded that the first song—the one the defendant did not dispute that he wrote—was probative of his comprehension skills and that the second song— the one the defendant disputed having written—was probative "in so far as [the defendant] claimed he had no prior knowledge about" different criminal activity in Dallas compared to where he was from. *Id.* at 893. However, the time needed to develop the evidence amounted to approximately 28% of the defendant's testimony, and "[e]vidence that consumes such an inordinate amount of time has the potential to confuse or distract the jury from the main issues." *Id.* at 894.

Regarding unfair prejudice, the court observed that other jurisdictions had recognized that admitting rap music or rap videos can be highly prejudicial due to the nature of lyrics that distract from the charged offense. *Id.* Because the videos introduced by the State "were a glorification of criminal activity" in that they included references to illicit drugs, criminal activity in general, snitching, owning weapons, degrading women, and being a "trap king," they encouraged the jury to convict on the improper basis that the defendant generally was a criminal or associated with criminals. *Id.* at 895–96 ("[M]usic lyrics do not prove anything about the character of

the person who listens to the music or lip syncs to it on video."). The court determined that the prejudicial factor weighed heavily for exclusion when the State did not offer anything showing that the lyrics and video were somehow representative of the defendant's character in that they applied outside of the artistic rendering or that—if they had some real-world application—they were relevant to the charged offense. *Id.* at 896. The court also explained that the videos' probative value was incredibly weak, "especially where the State introduced no evidence that [the defendant] authored the lyrics, or merely memorized them." *Id.*

Further, the videos' introduction was unnecessary when "there was no evidence outside of the lyrics themselves corroborating that [the defendant] was a violent or unfriendly person," and the State had other evidence to demonstrate his knowledge of criminal activity and potential association with that activity other than the videos and had the opportunity to cross-examine his mother, "who presumably would have much more pertinent, relevant insight into [the defendant's] ability to understand language than rehearsed, choreographed, and inflammatory music videos would." *Id.* at 896–97.[49] And the trial court did not give the jury a limiting instruction to restrict its use of the rap videos to their stated purpose. *Id.* at 898.

---

[49]In *Hart*, during the defense's case, outside the jury's presence, a psychologist evaluated the defendant and found that he was competent but had a below-average IQ that would make him unable to think abstractly about motives or consequences; the trial court denied the defense's request to put that evidence before the jury. 688 S.W.3d at 888. The court concluded that the rap videos' admission constituted harm because of the single issue before the jury—mens rea—and the trial court's

45

In *Hall*, another case cited by Braylin for its Rule 403 analysis, the Court of Criminal Appeals considered video evidence used in a capital murder trial's punishment phase. 663 S.W.3d at 27–28. The State presented the jury with footage showing the defendant's interacting with a comedian who had been filming at the detention center and in which the defendant, other inmates, and the comedian could be seen and heard bantering about life in jail, the defendant's appearance and demeanor, the death penalty, and criminality in general. *Id.* at 24. The defendant objected under Rules 401, 402, and 403, complaining that the video's contents were not relevant to the punishment issues and, alternatively, that any slight relevance was substantially outweighed by the capacity for unfair prejudice, confusing the issues, and misleading the jury. *Id.* at 30. In his petition for review, he argued that the entire video lacked any relevance to the statutory special issues because most of the statements in it were made by people other than the defendant and its "essential context" as an entertainment product would make it impossible for a factfinder to draw any meaningful inferences from his statements. *Id.* at 31.

By his own admission, the defendant had "brutally stabbed then shot a complete stranger to death, not out of self-defense or because he was under any form of duress, but simply because he wanted to" and then he had slashed the throat of the elderly victim's wheelchair-bound wife. *Id.* at 26. After reviewing the video, the court

having excluded the IQ testimony, preventing the jury from hearing the defendant's side of the story even before the rap videos were introduced. *Id.* at 897–98.

46

identified three of the defendant's statements with some relevance to the future-dangerousness special issue: (1) his comment that Texas would hang or "basically[] screw you over . . . [for] the most, uh, petty sh-t"; (2) his response, when asked if he was in there for hacking someone's computer—"Something like that, yes"—before another inmate added, "'Hacking' being the operative word," and the defendant's stating, "Yeah, used a machete on someone's screen"; and (3) in response to the defendant's comment "I wouldn't hurt a fly," and the comedian's rebuttal, "What about a human?" the defendant's reply, "Eh, they're annoying. We'll leave'em to their own devices." *Id.* at 31–32.

The court noted that a rational factfinder viewing the video "could conclude that [the defendant] appears relatively relaxed and unguarded throughout" and that his interactions with the comedian and other inmates thus reflected his honest opinions, particularly as the jury was aware of the context in which he had made his remarks, making the video "uniquely and powerfully probative of [his] character and perception of the underlying capital murder." *Id.* at 32, 33. And because the trial court could have concluded that the jury had no other way to observe the defendant's unguarded demeanor in a confined setting and that the uniqueness of this glimpse into his character and thoughts greatly increased the State's need for it, those factors weighed in favor of the video's admission. *Id.* at 33. Further, the video showed when the defendant openly agreed or did not agree with other inmates' statements, the video was just under nine minutes long, and the video required a single witness to lay

47

foundation for it. *Id.* at 34. The court concluded that the trial court did not abuse its discretion by admitting it over the defendant's Rule 403 objection. *Id.*

### 2. Application

Here, the State argues that Braylin opened the door in his direct testimony about being a rap artist and specifically opened the door to the admission of this particular song's lyrics by testifying that he had not known about Big Kevin's relationship with Shay until Tink told him after Big Kevin's death, that he was not angry about Big Kevin and Shay's relationship, and that he did not know why Big Kevin died.

The State further argues that the lyrics rebutted Braylin's testimony and theory of the case and that under *Hart*, lyrics are admissible if they pertain to the charged offense and if evidence exists apart from the lyrics themselves that shows that they are something more than fiction. The State directs us to Braylin's testimony that the song was mostly about Big Kevin's death and that Big Kevin was "not the only person that Fort Worth has said that [he] got killed from jail," asserting that if Braylin had "stopped after admitting that the song was mostly about his father's death—which is what the song had been offered for—there would have been no unfair prejudice to him in the song lyrics." Instead, the State contends, Braylin, "introduced a new topic, the other people he was believed to have killed from jail. That was undoubtedly relevant to the charged offense, which had the same modus operandi" and was thus a highly relevant line of inquiry.

The State also points out that any prejudice Braylin suffered from the lyrics' admission was due to his own unprompted and unobjected-to explanations when he affirmatively offered—without a question from the prosecutor—to "interpret the lyrics" for the jury and volunteered that people had said he had killed his cousin Jaden, that he had a murder case pending involving Johnson, and that people suspected him of killing his own mother.

In response to the amount of time required by the evidence, the State argues that the time to publish the song itself was under four minutes, with eight pages to discuss the lyrics, but that it took longer because of Braylin's responses. The State further argues that it needed that evidence because the song, recorded in March 2022, was written by Braylin while his father's January 25, 2022 death was still fresh in his mind and corroborated the State's theory regarding his motive.

Although we agree with Braylin that he did not open the door merely by admitting that he "did" music, that it was rap music, that he had a music manager, that he made money from his music, and that Cotton asked him questions about his music, the trial court did not abuse its discretion by admitting this particular song over Braylin's Rule 404 objection because—as pointed out by the State—the trial court admitted it only after Braylin testified that he had not known about Big Kevin's relationship with Shay before Big Kevin's death, that he was not angry about that relationship, and that he did not know why Big Kevin had died. In contrast to Braylin's testimony, the lyrics, which Braylin recorded from jail and released not long

49

after Big Kevin's death, mentioned that Braylin had a "new charge" and that someone's body was found in a yard after "playing" him—both of which could be reasonably interpreted as pertaining to Big Kevin, particularly in light of Braylin's other lines about "R-I-P, K-B, my father for doing what he did," "My little sis . . . she mad at me," and "Don't be mad at me, be mad at your pops for what he did." These lyrics directly pertained to the charged offense, Braylin's motive, his intent, and his modus operandi. *See* Tex. R. Evid. 404(b)(2).

Furthermore, the trial court did not abuse its discretion by overruling Braylin's Rule 403 objection under *Hart* or *Hall* because the lyrics' probative value was not substantially outweighed by the danger of unfair prejudice, confusion, misleading the jury, undue delay, or needlessly presenting cumulative evidence.

The lyrics were inherently probative and necessary to the State's case in that they supported the State's theory that Braylin had arranged the drive-by shooting in revenge for Big Kevin's affair with Shay, the mother of Little Kevin's son, and contradicted Braylin's testimony that he had nothing to do with Big Kevin's death. Unlike in *Hart*, the lyrics did not tend to suggest a decision on an improper basis; the State did not offer the lyrics to show Braylin's character and sophistication, Braylin admitted—unlike the defendant in *Hart*—that he had written and performed the song, and the trial court included a general limiting instruction in the charge. *Cf.* 688 S.W.3d at 887–89, 896–97.

50

Additionally, the lyrics here did not distract from the charged offense—instead, they were directly on point regarding Braylin's motive, notwithstanding his attempts to confuse the issue by attempting to explain the lyrics as referring to others. *Cf. id.* at 894, 896. No video accompanied the song, which was recorded by phone from jail. And the jury had no other evidence from which to glimpse into Braylin's uncensored thoughts about Big Kevin after the murder. *See Hall*, 663 S.W.3d at 34. Although Braylin contends that the lyrics "were a glorification of criminal activity," their overall gist was that Braylin was ensconced in family drama—his little sister was mad at him, he had been charged, someone's body had been found in a yard, his father was dead "for doing what he did," and the father, not Braylin, should be blamed.

Although Braylin complains about the amount of time spent on the lyrics, if the State had been able to introduce them without Braylin's frequent digressions, as reflected in the record, the presentation would have taken less time. Although under *Hart*, the cumulative time weighs against admission, *see* 688 S.W.3d at 893, it does not tip the balance here in light of the above. Accordingly, we conclude that the trial court did not abuse its discretion by overruling Braylin's Rule 403 and 404 objections, and we overrule his first point.

## C. Body-camera footage

In his second point, Braylin contends that twelve minutes of Corporal Miller's 17-minute-and-14-second body-camera footage were unfairly prejudicial because they merely showed life-saving techniques being used on Big Kevin and Shay's dry

heaving. Braylin argues that the video was "unquestionably gruesome" and that the State could have used other methods to prove that Big Kevin died and that paramedics tried to save his life.

The State responds that the footage was probative of the crime scene and the victim's injuries and that it was necessary for the State in developing its case because it depicted the shooting's immediate aftermath and provided direct information to the jury about where Big Kevin was shot. The footage also showed that the deceased was Big Kevin, the same person Braylin was on trial for murdering, which was a disputed fact at trial based on Braylin's directed-verdict motion.[50]

Images that show a body's location at the crime scene and the wounds that caused the victim's death are relevant during a trial's guilt phase. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). In *Shuffield*, the Court of Criminal Appeals discussed the admissibility of photos and factors to consider, including gruesomeness. *Id.*

Assuming without deciding that the trial court abused its discretion by admitting this footage,[51] as set out below, the evidence did not have a "substantial and

---

[50]In his motion for directed verdict, Braylin contended that there was no witness to identify the deceased from the autopsy photos.

[51]Body-camera video of a complainant's shooting injuries is generally admissible under Rule 403 if it shows "only the injuries that the victim received and are no more gruesome than would be expected," even if disturbing and graphic. *See Castillo v. State*, No. 14-15-00753-CR, 2016 WL 7177729, at *1 (Tex. App.—Houston [14th Dist.]

injurious effect or influence in determining the jury's verdict" in light of all of the properly admitted evidence set out above. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); *see also* Tex. R. App. P. 44.2(b).

An error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider, among other things, (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002).

No one disputed Big Kevin's murder. The trial's contested issue was whether Braylin was a party, and as set out in our sufficiency review, the State showed beyond a reasonable doubt that Braylin was not only a party to the offense but also the offense's mastermind. The prosecutor did not reference the body-camera footage in his guilt–innocence closing; instead, he directed the jury to the video of the drive-by shooting, stating, "You saw an intentional killing of Kevin Brown, right? So the only

Dec. 8, 2016, pet. ref'd) (mem. op., not designated for publication) (quoting *Shuffield*, 189 S.W.3d at 787–88).

question is, what does Braylin have to do with it. It's all in the messages. It's in the calls." The defense did not address the body-camera footage either, focusing on witness credibility by accusing the accomplices of lying, identifying deficiencies in the State's investigation, and claiming that Braylin had testified truthfully.

In light of the rest of the State's evidence (particularly Braylin's own messages) and in light of Braylin's own testimony during the defense case, the body-camera footage either had no influence or such a slight effect as to be negligible. We overrule Braylin's second point.

## D. Social media records

In his third point, Braylin argues that the trial court abused its discretion by admitting into evidence his Facebook and Instagram records (State's Exhibits 296–304) and the Instagram records of Durham (State's Exhibit 125) and Cotton (State's Exhibit 126) because they were not properly authenticated.

### 1. Applicable law

Under Rule of Evidence 104(a), whether to admit evidence is a preliminary question for the trial court, and Rule 901(a) defines authentication as an admissibility "condition precedent" that requires the proponent to make a threshold showing that would be "sufficient to support a finding that the matter in question is what its proponent claims." *Tienda v. State*, 358 S.W.3d 633, 637–38 (Tex. Crim. App. 2012). Rule 901 merely requires sufficient evidence to support authentication and "does not ordinarily require the trial court to make a threshold determination of the credibility

of the evidence proffered by the proponent to establish authenticity." *Butler v. State*, 459 S.W.3d 595, 605 (Tex. Crim. App. 2015). In performing its Rule 104 gate-keeping function in a jury trial, the trial court must be persuaded that the evidence's proponent has supplied facts sufficient to support a reasonable jury's determination that the evidence is authentic. *Tienda*, 358 S.W.3d at 637–38.

The question of authentication arises when the relevance of proffered evidence depends upon its identity, source, or connection with a particular person, place, thing, or event. *Jones v. State*, 466 S.W.3d 252, 261 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting *Angleton v. State*, 971 S.W.2 65, 70 (Tex. Crim. App. 1998)). "Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence." *Tienda*, 358 S.W.3d at 638.

Rule 901 contains a nonexclusive list of examples of evidence that satisfy the authentication requirement, including testimony of a witness with knowledge that an item is what it is claimed to be; distinctive characteristics such as appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances; and "[a]ny method of authentication or identification allowed by a statute or other rule prescribed under statutory authority." Tex. R. Evid. 901(b)(1), (4), (10). Under Rule 902, self-authenticating evidence requires no extrinsic evidence of authenticity to be admissible. Tex. R. Evid. 902. If the original or a copy of a record meets Rule 803(6)'s hearsay-exception requirements

and is accompanied by a compliant business-records affidavit and both are served as required, then the original or copy of the record is self-authenticating. Tex. R. Evid. 902(10).

The Court of Criminal Appeals broke ground on the authentication of social-media evidence in *Tienda*. In that case, after a gang-related shootout, the victim's sister provided the State with information regarding three MySpace profile pages that she believed the defendant had created and maintained. 358 S.W.3d at 634. The State subpoenaed MySpace.com for the "subscriber report" associated with each profile account, printed out images of each profile page directly from the MySpace.com website, and then marked the profile pages and related contents as exhibits and used the victim's sister as their sponsoring witness during guilt–innocence over the defendant's authenticity objection. *Id.* at 634–35.

The subscriber reports and pages' contents supported their authentication—showing the defendant's names, photos, and messages containing specific references to others present during the shooting, the shooting's circumstances, and details about the State's subsequent investigation—while, through cross-examination of the victim's sister, the defense elicited testimony about how easily a person could create a MySpace page in someone else's name and emphasized that any case-specific facts in the messages associated with the accounts were not facts solely within the defendant's knowledge but were also known to the deceased's family and friends and to any other interested third parties. *Id.* at 635–36.

The court noted ab initio that "the rules of evidence already in place for determining authenticity are at least generally 'adequate to the task'" for determining the admissibility of electronically generated, transmitted, or stored information, including that found on social networking websites. *Id.* at 638–39. The court held that the MySpace postings' internal content—photographs, comments, and music—constituted sufficient circumstantial evidence to establish a prima facie case such that a reasonable juror could have found that the defendant created and maintained them. *Id.* at 642. Upon the State's prima-facie showing that the defendant and not some unidentified conspirators had created and maintained the MySpace pages, the jury was entitled to assess the likelihood of any alternative scenario for the pages' creation. *Id.* at 645–46.

The Court of Criminal Appeals has also considered text-message authentication, noting that although a cell phone number does not necessarily establish the user's identity at a particular moment in time with the same definitiveness that fingerprints, signatures, photographs, or DNA, that number, combined with other circumstances—such as the message's appearance, contents, substance, internal patterns, or other distinctive characteristics—may support a conclusion that the message emanated from the purported author. *Butler*, 459 S.W.3d at 601–03. The court observed that when considering the admissibility of text messages, letters, emails, or other writings,

such matters may sometimes be authenticated by distinctive characteristics found within the writings themselves and by comparative reference from those characteristics to other circumstances shown to exist by the evidence presented at trial. Conversations and events that precede or follow the communications at issue, when identified or referred to within the written communication, can provide contextual evidence demonstrating the authenticity of such communications.

*Id.* at 603–04 (footnotes omitted).

In sum, to the extent that an unchallenged business records affidavit alone might not otherwise be sufficient to authenticate social media records, the surrounding circumstances, content, conversations, and events that precede or follow the disputed communications may provide the necessary contextual evidence to demonstrate the records' authenticity. *See id. Compare Williams v. State*, No. 04-17-00815-CR, 2024 WL 5251962, at \*17 (Tex. App.—San Antonio Dec. 31, 2024, pet. ref'd) (mem. op., not designated for publication) (holding State's business records affidavit and circumstantial evidence showed that the defendant was responsible for Backpage ad's posting), *with Ryder v. State*, 581 S.W.3d 439, 455 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding exhibits that contained Facebook's business records and a "Certificate of Authenticity of Domestic Records of Regularly Conducted Activity" were sufficient to authenticate records and "obviat[ed] the State's need to produce additional extrinsic evidence to satisfy the authentication threshold").

## 2. State's Exhibits 125 and 126

Braylin objected to State's Exhibits 125 and 126 based on authentication. The State offered, and the trial court admitted into the record, the business records affidavits from Facebook that substantially complied with the required language set out in Rule 902(10).[52]

The State asserts that at issue are "only those entries into Exhibit 128 that came from Exhibits 125 and 126," to-wit, two posts authenticated from records Detective Sones obtained and that, by their content, were "sufficient to authenticate them as being a genuine communication from [Cotton] and a genuine communication between him and [Durham]." Braylin appears to agree, stating, "In the present case, the State did not provide sufficient evidence to show that the offered messages in State's Exhibit 128 were actually authored by" Durham or Cotton. He points out that the State never asked Durham to authenticate State's Exhibit 125, that Cotton did not testify, and that "[i]t is not uncommon for multiple people to have access or post messages on a social media account such as Instagram." The State responds that the admission was harmless because both "contested posts are corroborative of [Durham's] in-court testimony and cumulative of other[,] uncontested posts made on the same days."

---

[52]Braylin did not and does not challenge the affidavits' sufficiency.

The two entries were:

- Cotton's message on Instagram to an unknown user on January 23, 2022, which stated, "Im literally finna be outside & im finna meet this n-gga to get these bullets i was scoping some shyt out right by ya shyt" and

- Cotton's message on Instagram to Durham on January 24, 2022, when he messaged her, "Lets go by that one house," and she responded that she was going to try and get gas money so she could come pick him up.

Regarding Cotton's January 23, 2022 message to the unknown user, other evidence showed that on that day, Braylin asked Abeyta to contact Cotton to find out what kind of bullets he needed, told her to go to Academy to buy them and that he would reimburse her, and told her that he needed her to "takem to him!" A few hours later, he messaged Abeyta to ask whether she bought them. At 7:31 p.m., Abeyta made an outgoing call to Cotton, and at 7:35 p.m., Cotton sent the complained-of message about meeting someone "to get these bullets." Further, Braylin testified that he told her to buy the ammunition and deliver it to Cotton.

As to the other message, Detective Sones testified without objection that, per Durham's statement to him, the murder was supposed to occur on January 24 but did not because her car was out of gas. Durham also testified that Cotton had texted her for a ride to the house on January 24, but that her car was out of gas. She agreed to take Cotton there the next day, and Braylin directed Rich to send money to Durham's Cash App account. Other evidence showed that Rich transferred $25 to Durham, after which Durham put gas in the car and picked Cotton up on January 25.

Notwithstanding the business records affidavits' authentication, the remaining circumstances and testimony also authenticate these two messages, and Braylin does not identify other specific messages in State's Exhibits 125 and 126 beyond "the offered messages in State's Exhibit 128." *See* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (citing Rule 38.1(i) for the proposition that the court is under no obligation to make the appellant's arguments for him). We overrule this portion of his third point.

### 3. State's Exhibits 296–304

In the remainder of his third point, Braylin argues that the trial court abused its discretion by admitting State's Exhibits 296–304 because they were hearsay and not properly authenticated. Braylin complains that the State did not provide sufficient evidence to show that the messages in State's Exhibits 296–304 were authored by him and that their admission harmed him because they contained "a lot of gang violence and threatened violence."

The State responds that Braylin's social media posts were admitted during punishment not only as business records but also through Detective Koplin's testimony about his familiarity with Braylin, Braylin's criminal history, and Braylin's involvement in the 2021 shooting at Dwill's mother's home, making the posts sufficiently authenticated and not hearsay.

During guilt–innocence, Braylin acknowledged he was Crazy Boy Bray. During punishment, Detective Koplin testified that State's Exhibits 296–304 were taken from

the Facebook business records that he obtained pursuant to a search warrant. After the trial court admitted State's Exhibits 296–304 over Braylin's hearsay and authentication objections, Detective Koplin identified the exhibits as Crazy Boy Bray's social media account records. The content of at least some of the posts provided sufficient authentication as having been authored by Braylin because they were messages between Braylin and his known associates made close in time to the shooting at the house where Dwill's mother was staying. Detective Koplin also testified that Dwill told him that someone who identified as "B. Brown" had threatened him and his family over social media on the day of the shooting.

We agree with the State that any remaining posts that might have been insufficiently authenticated or that might have otherwise been inadmissible hearsay were ultimately harmless considering the remaining punishment evidence, particularly Braylin's involvement in an additional murder and his acknowledged gang membership. *See King*, 953 S.W.2d at 271; *see also* Tex. R. App. P. 44.2(b). We overrule the remainder of Braylin's third point.

**E. Present sense impression**

In his fourth point, Braylin claims that the trial court abused its discretion by improperly admitting Gomez's testimony about Braylin's Facetime conversation as a present sense impression under Rule of Evidence 803(1). The State responds that the trial court properly admitted Braylin's implied admission in the Facetime exchange to show his consciousness of guilt and that the admission was harmless as a "trivial detail

compared to [Gomez's] testimony that he witnessed [Braylin] commit a drive-by shooting from mere feet away."

Rule 803(1) defines present sense impression as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Tex. R. Evid. 803(1). "Immediately after" means "after only a slight lapse of time." *Valmana v. State*, 605 S.W.3d 490, 507 (Tex. App.—El Paso 2020, pet. ref'd). No bright-line rule exists for determining whether a time lapse is too long for a statement to be considered as being made "immediately after" the declarant perceived the event. *Id.* at 507–08. For example, 911 calls are generally admissible under the exception because they indicate the caller was describing events as they happened. *Morgan v. State*, No. 02-19-00374-CR, 2020 WL 5949917, at *6 (Tex. App.—Fort Worth Oct. 8, 2020, no pet.) (mem. op., not designated for publication).

Here, the statements, "Crazy Boy Bray, Doodie just got shot" and "you better not have nothing to do with it," and Braylin's nonverbal response of hanging up on the speaker, made thirty minutes after the shooting, do more than push the edges of a present-sense statement made "immediately after," because they do not indicate that the speaker saw the shooting, and the surveillance video showed that there were no eyewitnesses besides the shooter and his companions. *Cf. Valmana*, 605 S.W.3d at 508 (holding that speaker's use of adverb "just" in statement, "This fool just broke a bottle over this dude's head," when no timeframe between the assault and statement was identified, supported trial court's concluding that the exception was met).

However, a trial court's evidentiary ruling will be upheld on appeal if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006).

The Facetime speaker's statements were proven with other evidence, including video and the remainder of Gomez's testimony, and their purpose was to show Braylin's nonverbal response, intended as a verbal-expression substitute: his implicit admission, by hanging up on the speaker, that he committed the shooting. This implicit admission was a statement of a party opponent, which is not hearsay, as well as a statement against interest, which is a hearsay exception. Tex. R. Evid. 801(a), (e)(2), 803(24)(B). Accordingly, the trial court did not abuse its discretion by admitting the testimony, and we overrule Braylin's fourth point.

## V. Conclusion

Having overruled all of Braylin's points, we modify the judgment to reflect that Braylin pleaded "true" to the enhancement allegation and affirm the trial court's judgment as modified.

Per Curiam

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 3, 2025

64